**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALEJANDRINA A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20-cv-4089** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Alejandrina A. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIBs"). The Commissioner brings a cross-motion for summary judgment seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons described herein, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #14), is denied and the Commissioner's motion to uphold the decision to deny benefits, (Dckt. #17), is granted.

I.      **BACKGROUND**

A.      **Procedural History**

On November 19, 2017, Claimant (then forty-three years old) filed an application for DIBs alleging disability dating back to October 29, 2015, due to limitations stemming from

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. Acting Commissioner of Social Security Kilolo Kijakazi has also been substituted as the named defendant. Fed.R.Civ.P. 25(d).

lower back pain, rheumatoid arthritis, and fibromyalgia. (Administrative Record ("R.")

212). Claimant later amended her onset date to December 24, 2017. (R. 208). Claimant's

application was denied initially and upon reconsideration. (R. 19). Claimant filed a timely

request for a hearing, which was held on May 24, 2019, before Administrative Law Judge

("ALJ") Laurie Wardell. (R. 39-72). Claimant appeared with counsel and offered testimony at

the hearing. A vocational expert also offered testimony. On June 19, 2019, the ALJ issued a

written decision denying Claimant's application for benefits. (R. 13-38). Claimant filed a timely

request for review with the Appeals Council, which was denied on May 7, 2020, (R. 1-8),

leaving the ALJ's decision as the final decision of the Commissioner. This action followed.

### B. The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that she is disabled,

meaning she cannot "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death, or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or

profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i).

At step two, the SSA determines whether the claimant has one or more medically determinable

physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically

acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical

or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If the claimant establishes that she has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess the claimant's residual functional capacity ("RFC"), or her capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id.* If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience. If such jobs exist, she is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

### C. The Evidence Presented to the ALJ

Claimant seeks disability benefits due to limitations stemming from lower back pain, rheumatoid arthritis, and fibromyalgia. She alleges an onset date of December 24, 2017, and her date last insured was December 31, 2019. (R. 20). Because the issues raised by Claimant on

3

appeal relate only to her rheumatoid arthritis ("RA") and fibromyalgia, the Court will narrow its discussion of the evidence to address only those impairments.

### 1. Evidence from Claimant's Medical Records

Claimant was diagnosed with RA in 2015. At the time, she complained of fatigue, joint pain, swelling (particularly in the wrists), and carpal tunnel syndrome. (R. 1818). Claimant began treating with rheumatologist Melissa Briones, M.D., in October 2017. (R. 833). On February 27, 2018, Dr. Briones noted that Claimant was "doing quite well" with her medications and that her joints were "much improved" from the last visit. (R. 498). Claimant's "Rapid 3" scores, which are a common measure of RA severity, were noted to be fairly low. These scores are calculated using a patient's self-reported answers in three categories: physical function, pain level, and overall feeling.[2] At the February 2018 appointment, Claimant's function score was a 1.3 out of 10 (with 0 representing the best-case scenario and 10 representing the worst), her pain score was a 2.5, and her overall feeling score was a 2.5. (R. 499). Together, these indicated "low severity" RA. (R. 500).

On April 8, 2018, Claimant's primary care doctor, Gregario Rosenstein, M.D., noted that her RA medication was disrupting her digestion and advised her to stop taking it. (R. 284). This break in medication caused an exacerbation of Claimant's RA symptoms. (R. 1795). On June 5, 2018, Dr. Briones opined that Claimant was "better than prior to treatment but now is on prednisone alone and though she reports no worsening symptoms, has lost ground on Rapid 3." (R. 1797). Claimant's functional score had risen to a 2.7, her pain score was a 5, and her overall feeling score was a 6, together indicating "high severity" RA. (R. 1796).

---

[2] Theodore Pincus et al., *RAPID3, an index to assess and monitor patients with rheumatoid arthritis, without formal joint counts: similar results to DAS28 and CDAI in clinical trials and clinical care*, 35 Rheumatic Disease Clinics of North Am. 773 (2009).

Three months later, on September 5, 2018, Dr. Briones observed that Claimant's joints were doing better, "but not as well as when her disease was under good control." (R. 1806). Claimant reported pain in her fingers and wrists, as well as swelling and stiffness in the morning. (*Id.*). Dr. Briones again noted that Claimant had "lost ground on Rapid 3 and need[ed] additional treatment." (R. 1808). Her function score was a 3.7, her pain score was a 9.5, and her overall score was an 8, indicating high severity RA. (*Id.*). On January 9, 2019, Claimant reported that her morning stiffness had "improved with being back on her RA regimen" and her carpal tunnel symptoms had resolved. (R. 1818). She also noted that her fibromyalgia was "really active." (*Id.*). Claimant's Rapid 3 scores remained largely unchanged, with a functional score of 4, a pain score of 8, and an overall score of 9, indicating severe RA. (R. 1820).

On February 27, 2019, Dr. Briones noted that Claimant had again stopped taking one of her prescribed medications "because another doctor told her not to take it." (R. 1830). Claimant reported increased stiffness and her Rapid 3 scores still indicated high severity. (R. 1830-32). Dr. Briones classified Claimant's RA as "uncontrolled." (R. 1832).

Claimant has also been diagnosed with fibromyalgia, which Bernardino Garcia, M.D., has treated since August 1, 2018. (R. 827). On August 30, 2018, Claimant reported body aches due to an exacerbation of the impairment. (R. 1756). On November 21, 2018, Claimant reported ten out of ten neck pain and Dr. Garcia observed that her fibromyalgia had recently "become much more active." (R. 1749-50). Still, Claimant presented with "normal sensation, reflexes, coordination, muscle strength and tone." (R. 1751). Dr. Garcia increased her Lyrica prescription and added Cymbalta. (*Id.*). Less than one month later, on December 13, 2018, Dr. Garcia wrote that Claimant's fibromyalgia was "actually getting better on current medications," (R. 1743), and noted that she was not in pain, (R. 1744). On March 18, 2019, Dr. Garcia again found that

Claimant's "overall symptoms [were] improving." (R. 1731). Claimant demonstrated normal sensation, reflexes, coordination, muscle strength, and muscle tone. (R. 1733).

### 2.    Opinions from Treating Physicians

Dr. Garcia completed a questionnaire about Claimant's fibromyalgia on December 21, 2018. He indicated that her prognosis was "poor" and that she suffered from the following fibromyalgia-related symptoms: multiple tender points, nonrestorative sleep, severe fatigue, morning stiffness, depression, dizziness, numbness and tingling, lack of endurance, impaired concentration, anxiety, and frequent, severe headaches. (R. 827). He noted that Claimant experienced pain in every body part aside from her chest, and that the pain was "chronic and constant." (*Id.*). He further found that Claimant's concentration and attention were "constantly" impacted by her fatigue and pain and that she had a "severe limitation" in dealing with work stress. (R. 829). Dr. Garcia concluded that Claimant did not retain the capacity for full-time work "due to pain," adding that she would need to lie down at unpredictable intervals during work shifts and would be absent more than three days per month due to her impairments. (*Id.*).

Dr. Briones completed a questionnaire regarding Claimant's RA on January 14, 2019. (R. 833). She noted that Claimant suffered from "daily, severe" joint pain, particularly in her hands and wrists. (R. 831). She further opined that Claimant's RA caused a reduced range of motion in her wrists, as well as joint warmth, swelling, tenderness, and fatigue, all of which would prohibit Claimant from sustaining fine and gross movements when the disease was "flaring or undertreated." (*Id.*). She found that Claimant's fatigue would "sometimes" impact her ability to sustain function, and that her pain and fatigue were "occasionally" severe enough to interfere with the attention and concentration needed to perform simple work tasks. (*Id.*). She added that Claimant's impairments had not lasted and could not be expected to last for at least

twelve months because "hopefully treatment will take effect." (R. 833). In the meantime, Claimant would require unscheduled breaks during the workday and would be absent from work about two days per month. (*Id.*).

### 3. Consultative Examination Findings

Fauzia Rana, M.D., completed a consultative examination of Claimant on January 18, 2018. During the exam, Claimant demonstrated full grip and muscle strength, and performed manipulations with both hands without difficulty. (R. 533). She had no difficulty getting on and off the exam table, tandem walking, walking on toes and heels, or squatting and arising, although she was unable to hop on one leg. (R. 534). Claimant's coordination was intact, her sensation was normal, and she had no limitation of movement in the spine. (*Id.*). She had a normal gait and could walk more than fifty feet without assistance. (*Id.*). Dr. Rana concluded that Claimant could "sit, speak, and hear without difficulty," but had "some difficulty in prolonged standing, walking, lifting, and carrying due to obesity, lower back pain, and shortness of breath." (R. 535).

### 4. Opinions from State Agency Consultants

State agency consultant Vidya Madala, M.D., reviewed Claimant's file on March 7, 2018. She found that Claimant could occasionally lift twenty pounds, frequently lift ten pounds, and could stand, walk, or sit for about six hours in an eight-hour day. (R. 78). She further found that Claimant could occasionally climb ladders, ropes, and scaffolds, and frequently stoop, kneel, crouch, and crawl. (R. 79). Claimant should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*). Dr. Madala concluded that Claimant was capable of light work. (R. 81). State agency consultant Charles Kenney, M.D., considered Claimant's file on June 12, 2018, and affirmed Dr. Madala's findings. (R. 90-91).

### 5. Evidence from Claimant

Claimant testified that she experiences arm and leg pain almost every day from RA and fibromyalgia.  (R. 48, 51).  Some days, the leg pain is so severe that she cannot walk.  (R. 51).  She testified that she cannot do laundry due to heat sensitivity and she never leaves the house alone out of fear that her ankle will lock and she will be unable to walk.  (R. 61-62).  While Claimant can typically cook simple meals, lift ten pounds, and walk a quarter of a mile, her capabilities are more limited on bad days, which occur about once a week.  (R. 59, 61).  Two or three times a week, she needs help tying or putting on shoes.  (R. 59).  Her medication helps with the pain but also causes drowsiness.  (R. 49).  Claimant feels tired "mostly every day" and lies down for an hour to an hour and a half most afternoons.  (R. 63-64).  When her fibromyalgia is especially bad, Claimant sleeps until noon.  (R. 64).  About two or three days per month, she stays in bed all day.  (R. 60).

### D. The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching the decision to deny Claimant's request for benefits.  At step one, she found that Claimant had not engaged in substantial gainful activity since her alleged onset date of December 24, 2017.  (R. 22).  At step two, she determined that Claimant suffered from the severe impairments of RA, fibromyalgia, degenerative disc disease, obesity, and asthma.  (*Id.*).  At step three, she concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the SSA's listed impairments, including 14.09 (inflammatory arthritis).  (R. 22-23).

Before turning to step four, the ALJ determined that Claimant had the RFC to perform sedentary work with the following limitations:

> The claimant can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.  The claimant can occasionally stoop, kneel, crouch, and crawl.  The

claimant can occasionally be exposed to dust, odors, and pulmonary irritants. The claimant can occasionally be exposed to humidity and temperature extremes. The claimant needs to shift positions (from sitting to standing or reverse) for [one to two] minutes every [thirty] minutes while on task. The claimant can occasionally be exposed to hazards. The claimant can frequent[ly] handle and finger with the right upper extremity. The claimant is limited to simple, routine, repetitive tasks, only simple, work-related decision-making, and only [occasional] changes in the work setting (due to pain).

(R. 23). Based on these findings, the ALJ found at step four that Claimant could not perform her past relevant work as a retail clerk or store laborer. (R. 30). Even so, at step five, she found that a sufficient number of jobs existed in the national economy that Claimant could perform given her age, education, work experience, and RFC. (R. 31). As such, the ALJ concluded that Claimant was not disabled from her alleged onset date through the date of the decision. (*Id.*).

## II. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner.

9

*McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether a claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## III. ANALYSIS

Claimant raises three arguments in support of remand: in particular, that the ALJ: (1) incorrectly found that Claimant did not meet or medically equal listing 14.09(D); (2) failed to accommodate her difficulties with concentration, persistence, and pace and her upper extremity limitations in the RFC; and (3) improperly discounted the opinion of Claimant's treating provider, Dr. Garcia. The Court disagrees on all counts and will address each argument in turn.

### A. The ALJ's assessment as to whether Claimant met or medically equaled Listing 14.09(D) was sufficient.

The listings describe impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of [her] age, education, or work experience." 20 C.F.R. §§404.1525(a), 416.925(a). They "were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To match a listing, the claimant bears the burden of showing that her impairment meets "all of the specified medical criteria." *Id.* at 530. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* When assessing whether a claimant

10

meets or equals a listed impairment, "the ALJ 'must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020).

Claimant's argument concerns listing 14.09(D).  To meet this listing, a claimant must show: (1) repeated manifestations of inflammatory arthritis, (2) with at least two constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss), and (3) a marked limitation in activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  20 C.F.R. Part 404, Subpart P, (Appendix 1).

Here, the ALJ found that Claimant did not meet this listing because the record failed to show that her RA was accompanied by the requisite constitutional signs or symptoms.  (R. 23). The ALJ further noted that:

> [E]ven if there were evidence of repeated manifestations of inflammatory arthritis with at least two of the symptoms described in Listing 14.09(D), the record does not show that the claimant has a marked limitation in activities of daily living, social functioning, or concentration, persistence, or pace, as vaguely argued by the claimant's representative in post-hearing brief.

(*Id.*).  Claimant argues that this assessment was insufficient in light of evidence showing that she meets all of 14.09(D)'s criteria.  She also asserts that, even if she did not meet the listing, remand is required because the ALJ failed to consider her fibromyalgia and obesity in combination with her other impairments when assessing medical equivalence to a listing.  (Dckt. #14 at 8-11).  For the following reasons, Claimant's assertions are unpersuasive.

### 1. Claimant failed to present evidence that her rheumatoid arthritis meets listing 14.09(D).

At the outset, the Court notes that the ALJ's analysis of 14.09(D)'s criteria was indeed sparse.  However, the Seventh Circuit has found that statements made elsewhere in an ALJ's decision may provide adequate support for her step three findings.  *See Curvin v. Colvin*, 778

F.3d 645, 650 (7th Cir. 2015) ("This [RFC] discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. We do not discount it simply because it appears elsewhere in the decision."); *see also Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021); *Jeske*, 955 F.3d at 590. Here, the ALJ's proper assessment of Claimant's functional abilities, as discussed in more detail below, *infra.* at Section III(B), provides the requisite logical bridge between the record and her conclusion that Claimant's RA did not meet listing 14.09(D). Even if it did not, Claimant has failed to cite evidence sufficient to support a finding that she meets the listing's criteria, as is her burden. *See Deloney v. Saul*, 840 Fed.Appx. 1, 5 (7th Cir. 2020) (claimant "had the burden of proving disability at step three"); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("Ribaudo has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."). Therefore, if there was an error, it was harmless.

As noted above, in addition to repeated manifestations of inflammatory arthritis, Claimant was required to show that she experienced at least two of four constitutional symptoms – severe fatigue, fever, malaise, or involuntary weight loss – to meet listing 14.09(D). She now argues that – contrary to the ALJ's finding – she met this burden by presenting evidence of both severe fatigue and malaise.[3] (Dckt. #14 at 9). Per the regulations, "severe fatigue" is defined as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(C)(2). Here, while Claimant cites multiple notes in the record suggesting that her RA caused *fatigue*, (Dckt. #14 at 8), she does not point to any medical evidence indicating that this fatigue frequently and significantly reduced her

---

[3] Claimant also argues that the ALJ's finding that she "did not have repeated manifestations of inflammatory arthritis," is "baffling in light of the medical record." (Dckt. #14 at 8). But the ALJ made no such finding. She merely found that Claimant did not suffer from RA manifestations *with* the symptoms outlined in 14.09(D).

12

physical activity or mental functioning, as required.  This is unsurprising, as Claimant's own rheumatologist opined that her fatigue would only "*sometimes*" impact her ability to sustain function and would only "*occasionally*" interfere with her attention and concentration.[4]  (R. 831).

Claimant next asserts that her "numerous symptoms of pain [and] swelling" constitute malaise.  (Dckt. #14 at 9).  The SSI defines malaise as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(C)(2).  As above, Claimant cites records showing significant joint pain, but fails to show that this pain significantly reduced her physical activity or mental functioning.  She also fails to acknowledge the ALJ's discussion of Claimant's RA pain in the RFC analysis.  In particular, the ALJ noted that Claimant's Rapid 3 functional scores were, at worst, in the "moderate" range.  (R. 26).  The fact that these functional scores remained moderate even when Claimant's *pain* score increased significantly, further suggests that any functional deficits were not tied to her RA-related pain.  *See* (R. 499) (February 2018 functional score of 1.3, pain score of 2.5); (R. 495) (June 2018 functional score of 2.7, pain score of 5); (R. 1808) (September 2018 functional score of 3.7, pain score of 9.5); (R. 1832) (February 2019 functional score of 3.3, pain score of 8).  The ALJ also credited Dr. Briones' finding – noted above – that Claimant's pain would only "occasionally" interfere with the attention and concentration needed to perform work tasks.  (R. 831).  For these reasons, the Court finds the ALJ's determination that Claimant's RA was not accompanied by two constitutional symptoms is supported by substantial evidence.

---

[4] The only medical evidence of "severe fatigue" related not to Claimant's RA, but to her fibromyalgia and spinal stenosis.  (R. 52, 64, 827, 834).

Moreover, even if Claimant had presented evidence supporting a finding of both severe fatigue and malaise, the ALJ's assessment would not require reversal where Claimant failed to demonstrate a marked limitation in her activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace, ("CPP"). A "marked" limitation is one that "seriously interferes with [one's] ability to function independently, appropriately, and effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 14.00(I)(5). Claimant argues that there is "substantial evidence in the record" to support a finding that she had a marked limitation in her ability to concentrate, persist, or maintain pace, "either as a result of depression, her physical impairments, or, most likely, from some combination thereof." (Dckt. #14 at 10). Again, this argument is unpersuasive given the record before the Court.

In support of her CPP argument, Claimant cites her own testimony that she is often fatigued, lies down for at least an hour every afternoon, suddenly starts crying, and has trouble understanding and completing tasks. (*Id.*) (citing R. 63, 64, 233). But the ALJ addressed these very complaints in the RFC assessment and found that they were not entirely consistent with the medical evidence. (R. 24). Claimant does not argue that this assessment was patently wrong and, therefore, cannot rely on these complaints to support her listings argument. *See Gwendolyn P. v. Kijakazi*, 20 C 3339, 2021 WL 5204858, at *3 (N.D.Ill. Nov. 9, 2021) (finding that a claimant's subjective complaints of fatigue did not support a 14.09(D) listing argument because the ALJ did not fully credit the claimant's statements). In fact, the only *medical* evidence Claimant cites in support of her alleged CPP limitation relates to her fibromyalgia and back pain, rather than her RA. (R.836). Not only were these opinions properly discredited by the ALJ, as discussed below, but they speak to whether Claimant *medically equaled* listing 14.09, not

whether she *met* it.  In any event, these opinions do not show that Claimant's limitations were "marked" as they do not find her difficulties with CPP affected her ability to function independently.

> **2.     Claimant failed to produce evidence showing that her impairments medically equaled listing 14.09(D).**

Claimant next argues that even if her RA did not *meet* listing 14.09, her fibromyalgia and obesity, considered in combination with her other impairments, medically *equal* the listing. (Dckt. #14 at 9).  Under SSR 17-2p, however, the record must contain one of the following pieces of evidence for an ALJ to conclude that an individual is disabled based on medical equivalence:

> (1) a prior administrative medical finding from [a medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding;
>
> (2) [medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding; or
>
> (3) a report from the [Appeals Council's] medical support staff supporting the medical equivalence finding.

SSR 17-2p (S.S.A. Mar. 27, 2017), 2017 WL 3928306, *3.  Claimant has cited no such evidence. Accordingly, there is no basis for a finding of medical equivalence.  *See Erica V. v. Saul*, No. 20 C 1106, 2020 WL 6381364, at *4 (N.D.Ill. Oct. 30, 2020) (claimant's argument that her symptoms were equivalent in severity to those described in a listing was insufficient to demonstrate medical equivalence where she did not identify any evidence from specific medical experts on equivalency as required under SSR 17-2p); *Sherrod v. Kijakazi*, No. 4:21-cv-49-RJ, 2022 WL 4130766, at *4 (E.D.N.C. Sept. 12, 2022) (same).

Indeed, the only medical experts who explicitly considered listing 14.09(D) – the state agency consultants – found that Claimant did *not* medically equal it. (R. 77, 89). The ALJ was permitted to rely on those findings. *See Fairbank v. Kijakazi*, No. 21-C-1088, 2022 WL 4091930, at *11 (E.D.Wis. June 24, 2022) (finding ALJ properly credited opinions of state agency consultants regarding medical equivalence) (citing *Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012) ("Because no other physician contradicted these two opinions, the ALJ did not err in accepting them.")); *Jones v. Colvin*, No. 16-cv-276-SEB-DKL, 2017 WL 652206, at *5 (S.D.Ind. Jan. 27, 2017) (finding the ALJ was not required to seek an additional opinion on medical equivalence where state agency consultants found that the claimant did not equal a listing and the ALJ's decision demonstrated "that he was aware of and considered" their reports, although he did not explicitly rely on them).

Although Claimant acknowledges that she did not supply the expert opinion needed to find medical equivalence, she argues that in the absence of such a report, the ALJ had a duty to "recontact [Claimant's] treating providers, or call upon an expert, to seek any clarification on the issue of listing equivalence." (Dckt. #14 at 9). This argument fails because SSR 17-2p clearly states that an ALJ need not seek expert evidence regarding equivalence when she "believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equal[ed] a listed impairment." SSR 17-2p, 2017 WL 3928306, at *4. Where, as here, the ALJ found that the evidence did *not* support such a finding, (R. 22), she was not required to seek additional evidence clarifying the issue. *See, e.g., Fairbank*, 2022 WL 4091930, at *11 (finding the ALJ was not required to ask another physician to perform a listing evaluation when "it was plaintiff's burden to present medical evidence supporting her claim"); *Dunn v. Kijakazi*, No. 20-C-1113, 2021 WL 5105169 at *8 (E.D.Wis. Sept. 24, 2021) (finding the ALJ properly relied on

the absence of any medical opinion supporting disability); *see also Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021) ("[Claimant] bears the burden to prove she is disabled by producing medical evidence.").

The Court's finding that the ALJ was not required to solicit an additional medical opinion is further supported by the fact that Claimant (1) was represented by an attorney, (2) was aware of the state agency consultants' findings that her impairments did *not* medically equal listing 14.09(D), and (3) otherwise failed to solicit a treating physician's opinion on equivalence or ask the ALJ to recontact the state agency consultants, despite continuing to add other evidence to the record. *See Buckhanon ex rel. J.H. v. Astrue*, 368 Fed.Appx. 674, 679 (7th Cir. 2010) (finding that under these circumstances, "[t]he appropriate inference is that Buckhanon decided that another expert opinion would not help her.").

Furthermore, per the regulations, a simple statement that a claimant's impairments do not medically equal a listing generally "constitutes sufficient articulation." SSR 17-2p, 2017 WL 3928306, at *4; *see also Waite v. Bowen*, 918 F.2d 1356, 1359 (7th Cir. 1987) (statement that claimant's impairment or combination of impairments did not medically equal a listing was "sufficient articulation to demonstrate that the ALJ considered the issue of medical equivalence"). The ALJ made such a statement here, noting that evidence related to Claimant's fibromyalgia and obesity did not support a finding of medical equivalence. (R. 22-23).

Finally, as explained above, an ALJ's "articulation of the reason(s) why [a claimant] is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for [the court] to determine the basis for the finding about medical equivalence at step [three]." SSR 17-2p, 2017 WL 3928306, at *4; *see also Erica V.*, 2020 WL 6381364, at *5 (finding no step three error where the ALJ's discussion of the effects of the claimant's

impairment "picked up in the next part of the ALJ's decision"). Here, the ALJ's discussion of Claimant's fibromyalgia and obesity in the RFC assessment provides the necessary logical bridge from the evidence to her finding that Claimant's impairments did not equal listing 14.09(D). Most notably, the ALJ found that Claimant's fibromyalgia symptoms had been significantly alleviated by medication and treatment. (R. 27). And Claimant's argument that the ALJ failed "to consider the bearing" of her severe obesity, (Dckt. #14 at 10), lacks merit because the ALJ directly accounted for the limitations stemming from Claimant's obesity – in particular, her difficulty with prolonged standing and walking, which the consultative examiner attributed to her obesity – by limiting her to sedentary work.[5]

Because there is substantial evidence supporting the ALJ's finding that Claimant's RA, fibromyalgia, and obesity – considered individually and in combination – did not amount to a presumptively disabling impairment under listing 14.09(D), remand is not required on this issue.

**B.      The ALJ's RFC assessment adequately accounted for all of Claimant's impairments.**

An ALJ's RFC findings are intended to capture "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1); *see also Moon v. Colvin*, 763 F.3d 718, 720 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014) ("Residual functional capacity is the extent to which a person can still work despite having health problems."). In this case, Claimant argues that the ALJ's RFC assessment failed to adequately accommodate her CPP deficits, as well as her limited ability to use her upper extremities. Again, the Court disagrees.

---

[5] Claimant states that the consultative examiner found limitations in prolonged sitting. (Dckt. #14 at 10). This is incorrect. Dr. Rana found limitations in prolonged standing, walking, lifting, and carrying, (R. 535), all of which are accounted for in the RFC.

1. **The ALJ adequately accounted for Claimant's limitations in concentration, persistence, and pace.**

When outlining the non-physical limitations included in the RFC, the ALJ wrote the following: "The claimant is limited to simple, routine, repetitive tasks, only simple work-related decision-making, and only occasional[] changes in the work setting (due to pain)." (R. 23). Claimant first argues that by acknowledging that these limitations were meant to account for her pain – rather than her difficulties with CPP – the ALJ "openly admitted" to neglecting her mental limitations. (Dckt. #14 at 12). However, Dr. Briones – whose opinion was partially credited by the ALJ – found that Claimant's CPP limitations stemmed *directly from* her pain. (R. 831). Thus, by accommodating that pain in the RFC, the ALJ "specifically excluded those tasks that someone with the claimant's limitations would be unable to perform," which is all that she was required to do. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *see also Recha v. Saul*, 843 Fed.Appx. 1, 4 (7th Cir. 2021) ("[A]n ALJ has some latitude with the exact wording of an RFC as long as it conveys in some way the restrictions necessary to address a claimant's limitations.").

For this same reason, Claimant's argument that the restriction to simple, routine, and repetitive tasks could not accommodate her limitations in CPP, (Dckt. #14 at 12), is also unpersuasive. *See Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009) (finding that because the claimant's difficulties with CPP were "rooted in [his] allegations of pain," the ALJ adequately accounted for them by accommodating that pain with a limitation to unskilled work); *see also Montalto v. Berryhill*, No. 17 C 5976, 2019 WL 1405602, at *8 (N.D.Ill. Mar. 28, 2019) ("By giving plaintiff a sedentary RFC, the ALJ accounted for [his] physical limitations, including limitations resulting from his pain which might have affected his social functioning.");

19

*Suzanne M. v. Comm'r of Soc. Sec.*, No. 17-cv-1425, 2018 WL 6817029 *6 (C.D.Ill. Nov. 9, 2018) (finding the ALJ adequately accounted for the claimant's mental limitations in RFC where such limitations were attributable to her physical symptoms, rather than her mental health).

Claimant next argues that the "the ALJ ignored documented evidence of limitations in [CPP]." (Dckt. #14 at 12). But the ALJ explicitly acknowledged the CPP-related findings of each treating provider who suggested that such limitations existed. (R. 28-29). Finally, Claimant suggests that "there is uncontroverted evidence in the record" that she "would be unable to work on a regular and continuing basis, eight hours a day, five days a week" due to her CPP limitations. (*Id.*). This, too, is incorrect. The ALJ's conclusion that Claimant sustained the capacity for full-time work was largely based on her finding that Claimant's RA, fibromyalgia, and degenerative disc disease – the impairments that physicians said would cause difficulties with CPP – were well-managed with treatment. She based this conclusion on treatment notes by Drs. Espinosa, Garcia, and Briones, who all indicated that Claimant's symptoms had abated with medication and surgery. As discussed below, this was a reasonable finding and provided adequate support for the ALJ's decision to discount the treating physicians' opinions about the extent of Claimant's CPP limitations. *See* n. 5 and Section III(C), *infra*.

### 2.      The ALJ adequately accounted for Claimant's physical limitations.

As for her physical RFC, Claimant argues that the evidence is "inconsistent with a finding that [she] can frequently use her right hand and fingers and, presumably, have unlimited use of her left." (Dckt. #14 at 14). It is true that Claimant's rheumatologist, Dr. Briones, found that when Claimant's RA was "flaring or undertreated," she would be precluded from sustained fine and gross movements. (R. 833). The ALJ found this opinion to be "somewhat persuasive," but noted that Dr. Briones "acknowledged resolution of [Claimant's] hand/wrist related

symptoms when [Claimant] was compliant with prescribed treatment." (R. 29). In fact, in the same report prescribing handling limitations, Dr. Briones noted that Claimant's impairments had not lasted and could not be expected to last for at least twelve months. (R. 833). Accordingly, Dr. Briones' report does not contradict the ALJ's findings. [6]

Claimant's argument regarding her physical RFC also fails to recognize the additional evidence that the ALJ relied on to support her handling and fingering findings, such as evidence that Claimant retained full grip strength, had no difficulty performing manipulations with either hand, and could use her hands for fingering, fine manipulation, handling, and gross manipulation for greater than two-thirds of an eight-hour workday. (R. 26, 29 (citing R. 533, 835)). Together, this evidence allows the Court to trace the path of the ALJ's reasoning from the record to the RFC. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

Rather than addressing the evidence relied on by the ALJ, Claimant simply cites evidence indicating that her RA caused pain, stiffness, and swelling. But again, the ALJ never found that Claimant had not experienced these symptoms. Rather, she found that they were alleviated with proper treatment – a finding supported by Claimant's own rheumatologist. Accordingly, the

---

[6] Claimant also argues that the ALJ improperly discounted Dr. Briones' opinion regarding fine and gross movements. Specifically, she argues that "temporary improvement, or even resolution of symptoms with treatment compliance," does not "inform as to an individual's capacity in a work setting." (Dckt. #14 at 15). This argument is unsupported. It is true that when assessing a claimant's limitations, "[t]he key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014). However, if a claimant's symptoms are *resolved* with treatment compliance, the only reasonable inference is that those symptoms would no longer affect that claimant's ability to work. *See, e.g., Lawrence J. v. Saul*, No. 19-cv-1834, 2020 WL 108428, at *4 (N.D.Ill. Jan. 9, 2020) (finding the ALJ adequately supported the decision not to include a migraine-related off-task time restriction by pointing to evidence that the claimant was able to manage his migraines with medication).

evidence cited by Claimant does not contradict the ALJ's physical RFC findings. For all of these reasons, the Court finds that the RFC adequately accounted for Claimant's physical and mental limitations.[7]

    **C.    The ALJ's assessment of the opinion of Claimant's treating physician Bernardino Garcia is supported by substantial evidence.**

Finally, Claimant argues that the ALJ improperly discounted the findings of Dr. Garcia, who treated Claimant's fibromyalgia. In his December 21, 2018 opinion, Dr. Garcia opined that Claimant experienced severe fatigue, depression, and pain in nearly every body part, among other symptoms. (R. 827). He further found that she would need to lie down at unpredictable intervals during the workday and would be absent more than three days per month due to her impairments. (R. 829). He described Claimant's pain as "chronic and constant" and noted that it – along with Claimant's fatigue – would "constantly" impact her concentration and attention. (R. 827-29). Dr. Garcia concluded that Claimant did not retain the capacity for full-time work "due to pain." (*Id.*).

The ALJ found this opinion to be unpersuasive, reasoning that it "lack[ed] support from his treatment records, which show that as of December 2018, there was improvement in the claimant's fibromyalgia with prescribed medications." (R. 28). She also found Dr. Garcia's findings to be inconsistent with his *own* treatment records, the treatment notes of others, and the consultative examination, "which show, at most, mild to moderate [physical limitations]." (*Id.*). Claimant raises two arguments as to why this assessment was improper. First, she asserts that

---

[7] Claimant also argues that the ALJ's failure to account for her handling and fingering limitations "lies in her apparent misunderstanding of fibromyalgia, as well as her tendency to draw false inferences from sporadic reports of improvement." (Dckt. #14 at 13). But the only evidence of handling and fingering limitations cited by Claimant stems from her *RA* – not her fibromyalgia. Accordingly, any inferences the ALJ did nor did not make about fibromyalgia are irrelevant to Claimant's RFC argument. The ALJ's reliance on the improvement of Claimant's fibromyalgia to discount Dr. Garcia's finding is addressed below. *See* Section III(C), *infra*.

Dr. Garcia's treatment notes were "far more dire than the ALJ suggested." (Dckt. #14 at 14). However, this argument is underdeveloped as Claimant fails to specify which notes the ALJ mischaracterized. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made it clear that perfunctory and undeveloped arguments . . . are waived."). Moreover, the fact that some of Dr. Garcia's records were consistent with his findings does not prohibit the ALJ from relying on those that were not, so long as she did not ignore findings that contradicted her conclusion. *See Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) ("[A]n ALJ may not ignore evidence that undercuts her conclusion.").

Claimant next asserts that the ALJ improperly relied on Dr. Garcia's December treatment note because "a single report of improvement (or even multiple reports of improvement) is not indicative of an ability to function in a full-time work setting." (Dckt. #14 at 14). The Court, however, agrees that the dire limitations outlined in Dr. Garcia's opinion were inconsistent with the note – written only *eight days earlier* – indicating that Claimant's fibromyalgia was "actually getting better on current medications," (R. 1743), as well as a note from *two months later* that Claimant's "overall symptoms [were] improving," (R. 1731). Furthermore, this was not the only discrepancy between Dr. Garcia's opinion and his records. His finding that Claimant was in "constant" pain, for example, was certainly inconsistent with his own notes indicating that Claimant was not in *any* pain. (R. 1732, 1735, 1741, 1744, 1754, 1763). The ALJ was entitled to discount Dr. Garcia's opinion based on such inconsistencies. *Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021) (an ALJ may decline to credit a treating physician's opinion when it "is inconsistent with the physician's treatment notes."); *Fair v. Saul*, 853 Fed.Appx. 17, 21 (7th Cir. 2021) (ALJ properly discounted treating physician's opinion where his "own records did not support his conclusions.").

The ALJ also cited inconsistencies between Dr. Garcia's findings and other physicians' treatment notes, which indicated that Claimant had only mild to moderate physical limitations. (R. 28). While Claimant does not address this reasoning, the Court's own review of the records cited by the ALJ suggests that her interpretation is supported by substantial evidence. For example, Dr. Garcia's finding that Claimant had spinal pain was inconsistent with treatment notes indicating no spinal tenderness, (R. 1882); his finding that Claimant suffered numbness and tingling was inconsistent with a treatment note indicating that she did not, (R. 494); his finding that heat aggravated Claimant's pain was inconsistent with evidence that Claimant denied heat intolerance, (R. 1881); and his finding regarding severe fatigue was inconsistent with notes showing that Claimant's fatigue had improved, (R. 501). Again, the ALJ's decision to discount Dr. Garcia's opinion based on this evidence was proper. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (ALJ properly rejected physician's opinion that was "at least partially inconsistent with the conclusions of several other physicians"); *Karr*, 989 F.3d at 512 (ALJ properly discounted treating physician's statement that was "inconsistent with other objective evidence in the record."). More generally, Dr. Garcia's finding that Claimant could not work due to constant and chronic pain was inconsistent with the consultative examiner's observation that Claimant had "no difficulty" performing various tasks, such as getting on and off the exam table, tandem walking, walking on toes and heels, or squatting and arising. (R. 534).

In sum: because the ALJ cited multiple legitimate examples of how the record did not support the significant limitations outlined by Dr. Garcia, her decision to discount his opinion was supported by substantial evidence. The Court will not – and indeed, cannot – reweigh the evidence now. *McKinzey*, 641 F.3d at 889.

**CONCLUSION**

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #14), is denied and the Commissioner's motion for summary judgment, (Dckt. #17), is granted. The decision of the ALJ is affirmed.

**ENTERED:   March 16, 2023**

**Jeffrey I. Cummings**
**United States Magistrate Judge**